UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEL GOMEZ,

                    Petitioner,                                Hon. Janet T. Neff

v.                                              Case No. 1:14-CV-407

MARY BERGHUIS,

                    Respondent.

_____/

**REPORT AND RECOMMENDATION**

This matter is before the Court on Gomez's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Gomez's petition be **denied**.

**BACKGROUND**

As a result of events allegedly occurring between January 1, 2007, and March 26, 2009, Petitioner was charged with ten (10) counts of First Degree Criminal Sexual Conduct and one charge of domestic violence. (Trial Transcript, October 19, 2010 at PageID.242-43). Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

**Martha Cruz**

As of March 26, 2009, Cruz was twelve (12) years of age. (Trial Transcript, October 19, 2010 at PageID.335). On this date, Petitioner, Cruz's step-father, discovered a note "from a boy" written to Cruz. (Trial Transcript, October 19, 2010 at PageID.335-36). Because Cruz "wasn't [supposed] to be talking to boys," Petitioner responded by choking and then slapping Cruz. (Trial Transcript, October 19, 2010 at PageID.336-40). Cruz's mother, Natalie Gomez, later asked Cruz if she was "still a virgin." (Trial Transcript, October 19, 2010 at PageID.338-42). Cruz responded by stating, "ask your husband." (Trial Transcript, October 19, 2010 at PageID.342). Gomez later took Cruz to speak with their pastor and then with the police. (Trial Transcript, October 19, 2010 at PageID.342-44).

In the winter of 2007, Petitioner first sexually assaulted Cruz. (Trial Transcript, October 19, 2010 at PageID.344-49). Specifically, Petitioner attempted to vaginally penetrate Cruz with his penis. (Trial Transcript, October 19, 2010 at PageID.344-49). A "couple weeks later," Petitioner sexually assaulted Cruz by penetrating her vaginally with his penis. (Trial Transcript, October 19, 2010 at PageID.349-50). Petitioner continued to sexually assault Cruz 2-3 times weekly through March 2009. (Trial Transcript, October 19, 2010 at PageID.349-55). At the conclusion of his assaults, Petitioner would often ejaculate onto a blanket or bedspread. (Trial Transcript, October 19, 2010 at PageID.349-55).

After Cruz reported Petitioner's actions to the police, Gomez told Cruz that "she didn't believe [her] and that [she] was lying every day." (Trial Transcript, October 19, 2010 at PageID.355-57). After "a couple of weeks" of hearing her mother accuse her of lying, Cruz told her mother "it didn't happen." (Trial Transcript, October 19, 2010 at PageID.356-57). Cruz told a

2

psychologist that "my mom didn't believe me so I said it wasn't true." (Trial Transcript, October 19, 2010 at PageID.357). Cruz later wrote a letter recanting her allegations against Petitioner because her mother instructed her to do so. (Trial Transcript, October 21, 2010 at PageID.659-60).

**Ben Seal**

As of March 2009, Seal was employed as a Trooper with the Michigan State Police. (Trial Transcript, October 19, 2010 at PageID.387-88). Seal was involved in the initial investigation of Martha Cruz's allegations against Petitioner. (Trial Transcript, October 19, 2010 at PageID.388). Cruz was "crying and, you know, visually upset" when she spoke with Seal. (Trial Transcript, October 19, 2010 at PageID.389). Cruz reported to Seal that Petitioner "would regularly come into her bedroom and have sex with her." (Trial Transcript, October 19, 2010 at PageID.389-93).

When Seal asked Cruz if there existed any DNA evidence to support her allegations, Cruz informed Seal that Petitioner often ejaculated on her bedding. (Trial Transcript, October 19, 2010 at PageID.395-96). These items were seized as evidence and submitted for DNA testing. (Trial Transcript, October 19, 2010 at PageID.395-406). After receiving the results of this DNA testing, Petitioner was arrested. (Trial Transcript, October 19, 2010 at PageID.407). During a subsequent interview, Petitioner stated that his wife "had recently been diagnosed with cancer in her private parts area, and there was some diminished sexual activity between the two of them because of that." (Trial Transcript, October 19, 2010 at PageID.405-06). Petitioner then "voluntarily" stated, "I know what you guys are thinking. . .I'm not having sex with Martha because my wife is having physical issues." (Trial Transcript, October 19, 2010 at PageID.406).

**Amber Jarnes**

Jarnes is a registered nurse who possesses a certification as Sexual Assault Nurse Examiner.  (Trial Transcript, October 19, 2010 at PageID.415-18).  Jarnes examined Martha Cruz on April 6, 2009.  (Trial Transcript, October 19, 2010 at PageID.421).  Cruz reported that Petitioner sexually assaulted her on multiple occasions.  (Trial Transcript, October 19, 2010 at PageID.421-25).  An examination of Cruz's vaginal area revealed an "irregular pattern" located "in the specific area where the majority of injuries from penetration are found."  (Trial Transcript, October 19, 2010 at PageID.426-32).

**James Henry, Ph.D.**

Henry is the Director of the Southwest Michigan Children's Trauma Assessment Center and was permitted to testify as an expert in the area of child sexual abuse.  (Trial Transcript, October 20, 2010 at PageID.456-61).  If a child who had been sexually assaulted was told by her mother on a daily basis that she was lying, such would "absolutely" cause the child to recant her allegations.  (Trial Transcript, October 20, 2010 at PageID.464-69).  The family disruption caused by revelations of sexual abuse create "tremendous pressure" on a child to recant.  (Trial Transcript, October 20, 2010 at PageID.472-73).

**Lisa Champion**

As part of the investigation of this matter, DNA samples were obtained from Martha Cruz, Petitioner, and Natalie Gomez and provided to the Michigan State Police.  (Trial Transcript, October 20, 2010 at PageID.485-92).  An examination of one of the items of bedding submitted for

evaluation revealed the presence of bodily fluids.  (Trial Transcript, October 20, 2010 at PageID.495-98).  Portions of this bedding were preserved and forwarded to Ann Hunt for DNA analysis.  (Trial Transcript, October 20, 2010 at PageID.498).

**Ann Hunt**

The bedding submitted for DNA testing contained areas of "mixed stains," or areas containing genetic material from two separate people.  (Trial Transcript, October 20, 2010 at PageID.517-18).  DNA analysis of these mixed stains revealed that it contained Petitioner's DNA and Martha Cruz's DNA.  (Trial Transcript, October 20, 2010 at PageID.518-21).  Natalie Gomez was excluded as a donor of the DNA discovered in these mixed stains.  (Trial Transcript, October 20, 2010 at PageID.521-22).

**Chris Shoemaker**

Shoemaker, a Michigan State Trooper, assisted Trooper Seal investigate Martha Cruz's allegations against Petitioner.  (Trial Transcript, October 20, 2010 at PageID.535-36).  Cruz told the Troopers that Petitioner sexually assaulted her "numerous times."  (Trial Transcript, October 20, 2010 at PageID.537-40).  Cruz also informed Shoemaker that there was bedding that might still contain Petitioner's bodily fluids.  (Trial Transcript, October 20, 2010 at PageID.550).  This bedding was subsequently seized as evidence.  (Trial Transcript, October 20, 2010 at PageID.550-52).

Trooper Shoemaker later participated in an interview of Petitioner.  (Trial Transcript, October 20, 2010 at PageID.552).  During this interview, Petitioner stated that he and his wife were no longer having sex because she was suffering cancer "in her privates."  (Trial Transcript, October

20, 2010 at PageID.555-56).  Petitioner then volunteered that this was the reason he was being accused of having sex with his step-daughter.  (Trial Transcript, October 20, 2010 at PageID.556).

**William Nichols**

Nichols is the Senior Pastor at Unity Temple where Petitioner and his family attended.  (Trial Transcript, October 20, 2010 at PageID.578).  On or about March 31, 2009, Petitioner, Natalie Gomez, and Martha Cruz met with Nichols concerning "an allegation Martha had made about [Petitioner]."  (Trial Transcript, October 20, 2010 at PageID.579-80).  After learning the nature of Cruz's allegations, Nichols asked Cruz, "is this the truth?"  (Trial Transcript, October 20, 2010 at PageID.581).  Cruz began "sobbing" and "nodded" that it was true.  (Trial Transcript, October 20, 2010 at PageID.581).  Nichols then instructed the family to contact the police.  (Trial Transcript, October 20, 2010 at PageID.580).

**Bobby Smith**

Smith is an elder and youth leader at Unity Temple.  (Trial Transcript, October 20, 2010 at PageID.583-84).  Smith has a "very good" relationship with Martha Cruz, but never spoke with her regarding her allegations against Petitioner.  (Trial Transcript, October 20, 2010 at PageID.584-85).

**Randall Haugen, Ph.D.**

Haugen is a psychologist focusing on abuse and neglect treating both offenders and victims.  (Trial Transcript, October 21, 2010 at PageID.592-94).  Dr. Haugen was permitted to

6

testify as an expert in the area of psychology.  (Trial Transcript, October 21, 2010 at PageID.595).

On May 5, 2009, Haugen met with Martha Cruz pursuant to a referral from Child Protective

Services.  (Trial Transcript, October 21, 2010 at PageID.595-96).  Cruz related to Haugen her

allegations against Petitioner.  (Trial Transcript, October 21, 2010 at PageID.596).  Cruz stated that

she made the allegations against Petitioner because she "was angry" and "was lying to get out of

some trouble that she was in at the time."  (Trial Transcript, October 21, 2010 at PageID.597).

Haugen administered to Cruz "The Million preadolescent Clinical Inventory," the

results of which indicated that Cruz "had behavior characteristics of children consistent with her

difficulty dealing with limits or the growing disregard for rules, tendency to be somewhat impulsive,

decreasing interest in school, conflicts with parents, authority figures are often which are individuals

with her profile, and problems with anger impulse control."  (Trial Transcript, October 21, 2010 at

PageID.599-600).  Haugen diagnosed Cruz with Disruptive Behavior Disorder.  (Trial Transcript,

October 21, 2010 at PageID.604).  Haugen acknowledged that "family pressure can cause a

recantation" of allegations.  (Trial Transcript, October 21, 2010 at PageID.606).  Statements Cruz

made during the interview indicated to Dr. Haugen that Cruz "was receiving pressure," but he could

not determine how much pressure was being applied.  (Trial Transcript, October 21, 2010 at

PageID.607-08).


**Natalie Gomez**

Gomez was diagnosed with cervical cancer in 2008.  (Trial Transcript, October 21,

2010 at PageID.619).  Prior to this diagnosis, Gomez had an active sex life with Petitioner, but

following her cancer diagnosis intercourse became "difficult" for her.  (Trial Transcript, October

21, 2010 at PageID.619-20).  In an attempt to "help [Petitioner] with his needs," Gomez would "help

him masturbate."  (Trial Transcript, October 21, 2010 at PageID.619-20).  At the conclusion of this

activity, Petitioner would ejaculate onto various bedding throughout the house including a blanket

which was later seized as evidence.  (Trial Transcript, October 21, 2010 at PageID.620-24).  Gomez

conceded, however, that she never shared this information with the police during their investigation

of her daughter's allegations.  (Trial Transcript, October 21, 2010 at PageID.625, 652).


**Paloma Mireles**

Mireles is a friend of Martha Cruz.  (Trial Transcript, October 21, 2010 at

PageID.630).  After Cruz made the allegations of sexual abuse against Petitioner, she subsequently

wrote a letter recanting her allegations.  (Trial Transcript, October 21, 2010 at PageID.630-32).

Mireles never heard anybody tell Cruz that she had to recant her allegations.  (Trial Transcript,

October 21, 2010 at PageID.632).


**Michael Guest**

Guest is married to Petitioner's sister.  (Trial Transcript, October 21, 2010 at

PageID.638).  After making her allegations of sexual abuse against Petitioner, Martha Cruz later

spoke privately with Guest and recanted her allegations.  (Trial Transcript, October 21, 2010 at

PageID.639-40).  When Guest asked Cruz if she understood "how serious this is," Cruz "just kind

of was laughing."  (Trial Transcript, October 21, 2010 at PageID.640-41).

8

**Maria Mireles**

Maria Mireles is Paloma Mireles' Mother.  (Trial Transcript, October 21, 2010 at PageID.665).   Martha Cruz wrote a letter recanting her allegations against Petitioner after acknowledging to Mireles that she was lying.  (Trial Transcript, October 21, 2010 at PageID.666-67).

Following the presentation of evidence, the jury found Petitioner guilty of ten (10) counts of First Degree Criminal Sexual Conduct and one charge of domestic violence.  (Trial Transcript, October 21, 2010 at PageID.714-15).   Petitioner was sentenced to serve concurrent prison sentences of 25-40 years on the ten criminal sexual conduct convictions and pay court costs on his domestic violence conviction.  (Sentencing Transcript, December 3, 2010 at PageID.740-41).   Petitioner subsequently appealed his conviction in the Michigan Court of Appeals asserting the following claims:

I.      The trial court abused its discretion in allowing testimony to be introduced through prosecution witnesses Ben Seal and Chris Shoemaker, which was inadmissible hearsay and inadmissible pursuant to MCL § 768.27(C).

II.     The trial court erred in permitting Amber Jarnes to offer opinion testimony in the matters of sexual assault and penetration.

III.    Whether under the Fourth Amendment of the United States Constitution Appellant was denied of his right to be free from unreasonable search and seizure where the Cass County District Court and the Circuit Court proceeded without jurisdiction; the warrant and complaint lacking any indicia of probable cause for the court to initiate proceedings on.

IV.     Whether under the 6th and 14th Amendment of the United States Constitution Appellant was denied a

fair trial where the prosecution, (a) failed to prove his opening statement, (b) improperly misled the jury, (c) improperly bolstering its victims credibility, and (d) argued facts not in evidence.[1]

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Gomez*, Case No. 301706, Opinion (Mich. Ct. App., Sept. 20, 2012). Petitioner subsequently moved in the Michigan Supreme Court for leave to appeal asserting claims I, III, and IV identified above. The court denied leave to appeal on the ground that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Gomez*, Case No. 146235, Order (Mich., May 22, 2013). On April 14, 2014, Petitioner initiated the present action asserting claims I-IV identified above.

## STANDARD OF REVIEW

Gomez's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

---

[1] Claims I and II were asserted by Plaintiff's appellate counsel whereas claims III and IV were asserted by Petitioner in a separate pro per filing.

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result." *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at

11

411.  Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.  Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context."  *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary."  *Ayers*, 623 F.3d at 308.  Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable."  *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision."  *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007).  This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

12

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2).  This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).  Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits."  *Id.* at 784-85.  Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely."  *Id.*  If this presumption is overcome, however, the Court reviews the matter de novo.  *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.**          **Hearsay Evidence Claim**  (Habeas Claim I)

As noted above, Michigan State Troopers Ben Seal and Chris Shoemaker both spoke with the victim in this case, Martha Cruz, at the outset of the investigation into Cruz's allegations against Petitioner.  Petitioner argues that the trial court abused its discretion by permitting Troopers

Seal and Shoemaker to testify as to statements made to them by Martha Cruz during their investigation.

A petition for writ of habeas corpus "shall not be granted" unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The petitioner properly exhausts his claims by "fairly presenting his federal claims to the state courts." *Jells v. Mitchell*, 538 F.3d 478, 488 (6th Cir. 2008) (citation omitted). The exhaustion requirement "is satisfied when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims." *Id.*

In his state court briefs, Petitioner argued that introduction of the testimony in question violated state law only. Petitioner made no reference, direct or inferential, that introduction of this testimony violated his rights under federal law. Thus, to the extent Petitioner asserts this claim as simply violating state law, such is not cognizable in this proceeding. *See* 28 U.S.C. § 2254. To the extent that Petitioner asserts in this Court that introduction of the testimony in question violates his rights under federal law, such has not been properly exhausted. Nevertheless, the Court possesses the authority to deny on the merits unexhausted claims asserted in a habeas petition. *See* 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"). Petitioner has not requested that the Court stay the present matter to further pursue this particular claim. Accordingly, the Court will address the merits of Petitioner's claim.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious

effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th

Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  This requires Petitioner to

demonstrate "actual prejudice" resulting from a constitutional error.  *Clemmons*, 34 F.3d at 357.

        To establish constitutional error, Petitioner cannot simply argue that the trial court's

evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law."

*Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Rather, Petitioner must establish that his conviction

violated the Constitution, laws, or treaties of the United States.  *Id.*  In this respect, it is recognized

that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness,

it may violate due process and thus warrant habeas relief."  *Bugh*, 329 F.3d at 512.

        Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d

at 358, and courts have defined those violations which violate fundamental fairness "very narrowly."

*Bugh*, 329 F.3d at 512.  State court evidentiary rulings do not offend due process unless they violate

"some principle of justice so rooted in the traditions and conscience of our people as to be ranked

as fundamental."  *Id.* (citations omitted).  Whether the admission of evidence constitutes a denial

of fundamental fairness "turns upon whether the evidence is material in the sense of a crucial,

critical highly significant factor."  *Ege v. Yukins*, 485 F.3d 364, 375 (6th. Cir. 2007).

        The Sixth Circuit has found that the improper introduction of evidence violated a

criminal defendant's right to a fair trial where the challenged evidence was the only direct evidence

linking the defendant to the crime.  *See Ege*, 485 F.3d at 374-78.  However, where there exists

sufficient other  evidence of guilt and the challenged evidence is only "peripheral to the case

against" the defendant, the Sixth Circuit has found no due process violation.  *Collier v. Lafler*, 2011

WL 1211465 at *3 (6th Cir., Mar. 30, 2011).  The Troopers' testimony concerning statements made

to them by Martha Cruz was only peripheral to the case against Petitioner.  Cruz herself testified and was subject to thorough cross-examination.  Moreover, the DNA evidence presented at trial strongly supports Petitioner's guilt.  Accordingly, this particular claim is rejected.

## II.        **Opinion Testimony Claim**  (Habeas Claim II)

Petitioner next claims that the trial court erred by permitting Amber Jarnes to offer opinion testimony on the topics of sexual assault and penetration.  While Petitioner presented this claim on direct appeal in the Michigan Court of Appeals, he did not present this claim to the Michigan Supreme Court.  Accordingly, this claim has not been properly exhausted.  The Court will nonetheless address the merits of this claim.

While the prosecution requested that Jarnes be permitted to testify as an expert in the area of sexual assault examinations, this request was denied by the trial court on the ground that Jarnes did not complete her certification as Sexual Assault Nurse Examiner until after she examined Martha Cruz.  (Trial Transcript, October 19, 2010 at PageID.415-21).  Jarnes instead limited her testimony to her examination of Cruz and her assessment and opinions as to what her examination revealed.  Introduction of such testimony did not deprive Petitioner of a fundamentally fair trial. This argument is, therefore, rejected.

## III.        **Fourth Amendment Claim**  (Habeas Claim III)

Petitioner asserts that he is entitled to relief because there did not exist probable cause to initiate criminal proceedings against him.  Petitioner's claim that the state court lacked jurisdiction under state law to conduct his criminal trial is a matter of state law which is not

16

cognizable in a federal habeas corpus proceeding.  *See Strunk v. Martin*, 27 Fed. Appx. 473, 475 (6th Cir., Nov. 6, 2001); *Milner v Hoffner*, 2017 WL 24793 at *10 (E.D. Mich., Jan. 3, 2017).  Moreover, alleged deficiencies in the state's initial criminal proceedings are not cognizable in a federal habeas proceeding, as such alleged deficiencies do not undermine the validity of any subsequent conviction.  *See, e.g., Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) (the Court recognized "the established rule that illegal arrest or detention does not void a subsequent conviction").  Accordingly, this claim is rejected.

## IV.        Prosecutorial Misconduct Claims  (Habeas Claim IV)

Finally, Petitioner argues that he is entitled to relief on the ground of prosecutorial misconduct.  Specifically, Petitioner argues that the prosecuting attorney engaged in the following acts of misconduct: (1) failed to prove his opening statement; (2) misled the jury, (3) improperly bolstered the credibility of a witness; and (4) argued facts not in evidence.

When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor."  *Cockream v. Jones*, 382 Fed. Appx. 479, 484 (6th Cir., June 29, 2010) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see also*, *Givens v. Yukins*, 2000 WL 1828484 at *6 (6th Cir., Dec. 5, 2000) ("[t]he aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused") (quoting *Phillips*, 455 U.S. at 219).  Thus, even if the challenged comments or actions

17

were improper, habeas relief is available only where such were "so flagrant as to render the entire trial fundamentally unfair." *Gillard*, 445 F.3d at 897.

When analyzing a claim of prosecutorial misconduct, the Court undertakes a two part analysis. The Court must first determine whether "the prosecutor's conduct and remarks were improper." *Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007). If such is the case, the Court must then determine "whether the impropriety was flagrant and thus warrants reversal." *Id.* at 759. When assessing whether an improper comment or action resulted in a denial of the right to a fair trial, the Court considers the following factors: (1) the likelihood that the comments or conduct mislead the jury or prejudiced the accused; (2) whether the comments or actions were extensive or isolated; (3) whether the comments or actions were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial. *Id.*

### A.    Opening Statement and Misleading the Jury

In his opening statement, the prosecuting attorney highlighted the role that DNA evidence would play in Petitioner's prosecution. Specifically, the prosecutor stated that, ". . .it comes down to Gomez's seminal fluid being mixed in with the vaginal fluid of his twelve-year-old stepdaughter and leaving a stain on the bedspread of his stepdaughter's bedspread in her bedroom." (Trial Transcript, October 19, 2010 at PageID.324). The prosecutor later stated that, ". . .they come up with DNA of the defendant's seminal fluid and the victim's vaginal fluid mixed together. . ." (Trial Transcript, October 19, 2010 at PageID.328). Petitioner argues that he is entitled to relief because Lisa Champion subsequently testified that "there's nothing to test for like vaginal secretions or anything like that." (Trial Transcript, October 20, 2010 at PageID.496). According to Petitioner,

18

Champion's testimony refutes the prosecutor's opening statement and rendered his trial unfair. Petitioner further argues that the prosecutor improperly mislead the jury by eliciting from Ann Hunt testimony that the biological material in these mixed stains was "likely to be a secretion from the body," possibly a "vaginal stain." (Trial Transcript, October 20, 2010 at PageID.530).

Petitioner's arguments are based upon a mischaracterization and selective reading of the trial testimony. As described above, Ann Hunt testified that the bedding submitted for DNA testing contained "mixed stains" containing genetic material from both Petitioner and Martha Cruz. Testing further excluded Natalie Gomez as a donor of the DNA discovered in these mixed stains. Thus, the evidence established that the bedding contained stains comprised of biological material from both Petitioner and Martha Cruz. The opening statements with which Petitioner disagrees constitute nothing more than reasonable inferences from the evidence and, as such, do not violate Petitioner's rights. *See, e.g., Davis v. Johnson*, - - - Fed. Appx. - - -, 2016 WL 5076038 at *3 (6th Cir., Sept. 20, 2016) (recognizing that prosecutors "must be given leeway to argue reasonable inferences from the evidence"). To the extent that the mixed stains on the bedding could have been produced in some way other than Petitioner and his step-daughter engaging in sexual activity, such was a matter which Petitioner was able to explore on cross-examination and argue to the jury. That the jury was unpersuaded by any such alternative theories is not a basis for overturning Petitioner's conviction. The Michigan Court of Appeals rejected this argument thusly:

> Defendant claims that references to the presence of the victim's vaginal fluid mixed with defendant's seminal fluid on the bedspread in the prosecutor's opening statement, in his questions to witnesses, and his closing argument constituted misconduct because defendant maintains that the evidence in this case does not support the argument that the victim's vaginal fluid was detected on the bedspread and that it was mixed with defendant's seminal fluid.

19

In regard to the argument about the victim's vaginal fluid, defendant correctly points out that the experts testified that there is no test that specifically identifies a bodily fluid stain as vaginal fluid. However, defendant's argument ignores the fact that the DNA expert explained that it was possible, and even likely, that the stain was from vaginal secretions. Additionally, the victim specifically testified to sexual intercourse with defendant on the bedspread from which the stain that was analyzed for DNA was collected. Thus, the prosecution's argument that the victim's DNA on the stain was the victim's vaginal fluid constituted a proper argument based on a reasonable inference that could arise from the evidence.

Similarly, in regard to the "mixed" nature of the stain, defendant correctly argues that the expert testified that she could not tell if the two stains were deposited on the bedspread at the same time. However, the expert did used the term "mixed stain" several times, and referenced the "mixed" nature of the sample several times, including stating that she found "a mixture that was consistent with" the victim's DNA and defendant's DNA. The prosecution specifically asked the expert whether the stain had two separate DNA donors, and she testified that yes, the stain had two separate donors.

Moreover, defense counsel asked the expert whether there is any way to determine how long the DNA was present on the bedspread, and she explained that the DNA would remain until the item is washed, and that there is some degradation of DNA over time based on the conditions it is subject to such as high heat and humidity. The prosecution asked the expert whether the DNA samples analyzed in this case were in any way degraded, and she testified that the samples were not degraded and she obtained a full profile. Accordingly, based on the testimony regarding the DNA evidence in combination with the victim's testimony, we conclude that the prosecution's arguments regarding the victim's vaginal fluid and the mixed nature of the stain were supported by the evidence because those arguments were based on reasonable inferences that may arise from the evidence. Thus, defendant has failed to demonstrate plain error affecting his substantial rights in connection with the alleged prosecutorial misconduct involving the prosecution's opening statement, closing argument, and alleged misleading of the jury.

*People v. Gomez*, Case No. 301706, Opinion at 7-8 (Mich. Ct. App., Sept. 20, 2012).

In light of the authority and evidence identified above, the Court concludes that this

determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

       B.      Bolstering Witness' Credibility

During the prosecution's examination of Dr. James Henry, the following exchange occurred:

> Q:     Hypothetically speaking, Doctor Henry, if a child, a twelve-year-old child has been sexually abused by her stepfather, and there finally came a disclosure, the stepfather is removed from the home, the child remains in the home with the mother, and the mother on a daily basis is telling her, "I don't believe you, you're lying, why are you doing this," would that have any impact on a child and cause her to recant?
>
> A:     Absolutely.

(Trial Transcript, October 20, 2010 at PageID.464).

Petitioner argues that this exchange constitutes an attempt by the prosecutor to improperly bolster the testimony of Martha Cruz.  It is well established that a prosecutor "may not express a personal opinion concerning the credibility of a trial witness because to do so exceeds the legitimate advocate's role by improperly inviting the jury to convict on a basis other than a neutral independent assessment of the record proof." *United States v. Owens*, 426 F.3d 800, 806 (6th Cir. 2005) (citations omitted).  Likewise, it is improper for a lay witness or an expert witness to offer an opinion vouching for the credibility of another witness. *See, e.g., Engesser v. Dooley*, 457 F.3d 731, 736 (8th Cir. 2006); *United States v. New*, 491 F.3d 369, 378 (8th Cir. 2007); *Maurer v. Department*

21

*of Corrections*, 32 F.3d 1286, 1289 (8th Cir. 1994).

      Dr. Henry did not vouch for Martha Cruz's credibility or otherwise comment whether he found her testimony worthy of belief. Instead, he was asked a hypothetical question designed to elicit whether there might be reasons, other than initial prevarication, that would explain a decision by an alleged victim of sexual assault to recant, if only temporarily, her allegations. The Michigan Court of Appeals rejected this particular claim, concluding as follows:

> the hypothetical posed to the expert was properly designed to explain the victim's specific behavior, her recantation in this case, that might be incorrectly construed by the jury as inconsistent with actual abuse. A jury might reasonably believe that recantation by a victim would not occur unless the victim was originally fabricating the sexual abuse; therefore, the expert testimony was required to demonstrate to the jury that victims of sexual abuse may recant their allegations for several reasons.

*People v. Gomez*, Case No. 301706, Opinion at 8 (Mich. Ct. App., Sept. 20, 2012).

      In light of the authority and evidence identified above, the Court concludes that this determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

      C.    Arguing Facts not in Evidence

      In his closing argument, the prosecutor argued, "that's [Petitioner's] seminal fluid on Martha [Cruz's] bedspread with her vaginal fluid, and I say vaginal fluid and I say it very deliberately because you get to consider all of the evidence, all of the evidence as a whole." (Trial Transcript, October 21, 2010 at PageID.670). The Prosecutor, in describing Ann Hunt's testimony,

stated:

> And the other thing that she testified to is that this is a mixture of those two, a mixture. It's not one stain that has been deposited in that area, dried, and a second stain put on top of it. It's a mixture of the two fluids as they dried together.

(Trial Transcript, October 21, 2010 at PageID.671).

Petitioner argues that these statements constitute by the prosecutor an argument based upon facts not in evidence. The Court disagrees. As discussed above, Ann Hunt testified that the bedding submitted for DNA testing contained "mixed stains" containing genetic material from both Petitioner and Martha Cruz. Hunt further testified that the biological material in these mixed stains was "likely to be a secretion from the body," possibly a "vaginal stain." Thus, the prosecutor's argument was based on inferences which could reasonably be drawn from the evidence. As previously noted, such constitutes permissible argument.

As previously noted, the Michigan Court of Appeals rejected this claim. In light of the authority and evidence identified above, the Court concludes that this determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Gomez's petition for writ of habeas corpus be **denied**. The undersigned further recommends that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  March 9, 2017                                  /s/ Ellen S. Carmody
                                                     ELLEN S. CARMODY
                                                     United States Magistrate Judge